## HOELL v. MELLON et al.

(District Court, E. D. New York. March 17, 1925.)

1. **Intoxicating liquors** ⊂⊃108(10)—**Proceeding for review of action of Commissioner of Internal Revenue in revoking permit held in nature of bill of review.**

Proceeding for review of action of Commissioner of Internal Revenue in revoking liquor permit, under National Prohibition Acts, §§ 5, 9 (Comp. St. Ann. Supp. 1923, §§ 10138½bb, 10138½dd), is a proceeding in the nature of a bill of review, though trial in such proceedings is de novo.

2. **Intoxicating liquors** ⊂⊃108(10)—**Action to review revocation of liquor permit by Commissioner of Internal Revenue should be commenced within reasonable time after Commissioner's decision.**

Action to review revocation by Commissioner of Internal Revenue of liquor permit, under National Prohibition Act, §§ 5, 9 (Comp. St. Ann. Supp. 1923, §§ 10138½bb, 10138½dd), should be commenced within reasonable time after Commissioner's decision.

3. **Intoxicating liquors** ⊂⊃108(10)—**Commissioner of Internal Revenue did not commit error at law in revoking permit, if there was any legal evidence on which he could base his decision.**

In action to review revocation of liquor permit by Commissioner of Internal Revenue, under National Prohibition Act, §§ 5, 9 (Comp. St. Ann. Supp. 1923, §§ 10138½bb, 10138½dd), the question as to whether the Commissioner committed error at law is whether there was any legal evidence before the Commissioner on which he could base a decision that plaintiff's permit should be revoked.

4. **Intoxicating liquors** ⊂⊃106(4) — **Permittee, who diverts alcohol received for special purposes and covers up diversion by fictitious sales, is not acting in good faith, within provision of statute providing for revocation of permit.**

A permittee, who receives special denatured alcohol from the government for purposes of manufacturing disinfectant, and who diverts alcohol, and seeks to cover up diversion by fictitious sales of disinfectant, is not acting in good faith in conforming with National Prohibition Act and regulations, within section 9 (Comp. St. Ann. Supp. 1923, § 10138½dd), providing for revocation of permit on permittee's failure in good faith to conform to provisions of act.

5. **Intoxicating liquors** ⊂⊃106(4)—**Rule as to revocation of liquor permit for failure in good faith to conform to provisions of act stated.**

Under National Prohibition Act, § 9 (Comp. St. Ann. Supp. 1923, § 10138½dd), providing for revocation of liquor permit where permittee has not in good faith conformed to provisions of act, the good faith must be absent in some act of permittee, so that such act, view-

ed in the light of surrounding circumstances, raises the fair inference of lack of good faith, an act of omission being as much an act within the statute as an act of commission.

**6. Intoxicating liquors ⟨key⟩108(5) — Evidence held insufficient to sustain finding of Commissioner of Internal Revenue that permittee had covered up diversion of liquor obtained for manufacturing purposes by fictitious sales.**

In action under National Prohibition Act, §§ 5, 9 (Comp. St. Ann. Supp. 1923, §§ 10138½bb, 10138½dd), to review revocation of liquor permit by Commissioner of Internal Revenue, evidence *held* insufficient to sustain finding of Commissioner that plaintiff, to whom permit had been issued for liquor for use in manufacturing disinfectant, diverted alcohol and covered up such diversion by fictitious sales of disinfectant.

**7. Intoxicating liquors ⟨key⟩108(5)—Permittee not presumed to have falsified books or acted in bad faith, in action to review revocation of permit by Commissioner of Internal Revenue.**

In action under National Prohibition Act, §§ 5, 9 (Comp. St. Ann. Supp. 1923, §§ 10138½bb, 10138½dd), to review revocation of liquor permit by Commissioner of Internal Revenue, there is no presumption that permittee falsified books or otherwise acted in bad faith.

Proceeding by Charles Hoell against Andrew W. Mellon and others. Judgment for plaintiff.

Roscoe C. Harper, of New York City, for plaintiff.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Guy O. Walser, of New York City, and Wm. L. Taggart, Sp. Atty. Prohibition Unit, of Washington, D. C., of counsel), for defendant.

INCH, District Judge. At the outset, it has seemed necessary to me to decide in my mind, in the absence of any controlling authority presented to or discovered by me, just what, if in any way, are the limits allowed in this kind of proceeding. The defendant's brief lays stress on the burden of proof, etc. I have used the word "proceeding" advisedly, for it seems to me that this word, appearing in section 5 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½bb), refers to all steps in procedure to be taken, rather than to any definite name of any step.

Judge Anderson, in O'Sullivan v. Potter (D. C.) 290 F. 844, in a similar case, says: "I think that the judicial review is, for most practical purposes, a trial de novo." Page 847. He indicates that this means that either party may plead and prove other violations or defenses than those interposed be-

fore the officer of the prohibition department, at the hearing which resulted in a revocation of a permit; also that apparently that case is the first case involving the scope and nature of the reviewing proceedings authorized under sections 5, 6, and 9 of title 2, of the National Prohibition Act.

A few months later, Judge Campbell, in this Eastern district, cited the O'Sullivan Case, apparently with approval, stating: "This is a trial de novo, and not merely a review of the Commissioner's decision, where no testimony can be received, other than the record of the hearing before the Commissioner." Schnitzler v. Yellowley (D. C.) 290 F. 849, at page 850. This Schnitzler Case, therefore, makes the present law of this district, and I follow the decision of Judge Campbell.

However, it should be noted that in this Case of Schnitzler the following appears: "The plaintiff contented herself with offering the record of the hearing before the Commissioner as her only evidence." Page 850. Nor does it clearly appear that much more was done in the Case of O'Sullivan.

In the case now before me, while testimony was taken, in addition to offering in evidence the record before the Commissioner, such testimony appears to be but a repetition of the former testimony, and in fact to a lesser degree.

[1] Accordingly, while I agree that it is a trial de novo, it seems to me that this action is one in the nature of a bill of review, thus allowed by the provisions of the National Prohibition Act, for that portion of section 5 applicable reads: "The manufacturer may by appropriate proceeding in a court of equity have the action of the Commissioner reviewed, and the court may affirm, modify, or reverse the finding of the Commissioner as the facts and law of the case may warrant, and during the pendency of such proceedings may restrain the manufacture, sale, or other disposition of such article."

This section 5 must be read in the light of section 9 (Comp. St. Ann. Supp. 1923, § 10138½dd), where the following appears: "Should the permit be revoked, * * * the permittee, may have a review of his decision before a court of equity in the manner provided in section 5 hereof. During the pendency of such action such permit shall be temporarily revoked." The word "action" in section 9 therefore, evidently refers to the form of action now pending before me, and which, as I have said, I believe to be in the nature of a bill of review.

Blackmore says: "The provision that a manufacturer may proceed in a court of equity and ask that the action of the Commissioner be reviewed was inserted at the suggestion of the manufacturers, to protect them against any arbitrary action." Page 209, Blackmore on Prohibition (2d Ed.). If I am correct, this would not mean that in this action there are no limits, as might be indicated, but that the purpose is to allow the decision to be reviewed within the limits ordinarily allowed in a bill of review.

"These are to correct errors apparent on the face of the record, and for newly discovered evidence after or for fraud in procuring the decision." Montgomery's Manual of Federal Procedure, § 1180. It would also seem it was intended that on the facts before the Commissioner a different conclusion might be reached. However the "review" feature of the action must not be overlooked.

[2] As no provision is made for an appeal by sections 5 or 9, it would seem that such action should be commenced within a reasonable time after the decision. Possibly because there is no appeal to a court allowed, Congress had in mind this method; which was often availed of, concurrent with an appeal, or when the time to appeal no longer existed. It was sometimes denied, when conflicting with an appeal. In re Brown (D. C.) 213 F. 701.

However, in this case now before me, there was no offer of any newly discovered evidence, or of evidence arising since the decision, or of fraud in arriving at the decision, and as I have said the testimony offered was apparently the same testimony, in a lesser degree, before the Commissioner.

[3] And without the necessity for drawing different conclusions from the facts, it remains to be seen whether or not the record before the Commissioner shows, in this action, error at law. In other words, was there any legal evidence before the Commissioner on which he could base a decision that plaintiff's permit should be revoked? Plaintiff offered in evidence the entire record before the Commissioner. It was received without objection, and marked Exhibit 1. It has become my task, therefore, to read through this very cumbersome exhibit.

From the record it is apparent that the hearing was conducted in a rather "free for all" manner; that hearsay and other incompetent testimony was received, on the theory that it was taken "for what it was worth." While not expecting hearings of an administrative department to be conducted with the exactness of a court, yet it might be ventured that the rules of evidence do not exist to make a trial harder, but to make the ascertainment of truth more certain. It is more difficult to arrive at the truth amid a mass of otherwise incompetent and irrelevant testimony. Apparently this very fact bothered the Commissioner, as a brief reference to the original charges and his decision will show.

The first charge was that plaintiff, the proprietor of the Jefferson Chemical Company, to whom a permit had been issued, was not in good faith conforming to the provisions of the National Prohibition Act and the regulations promulgated thereunder, in that he had failed to account for the use and disposition of all the specially denatured alcohol withdrawn by him under his permit. The second charge was that he had willfully and fraudulently falsified his commercial sales records, with the intent to cover up illicit use and diversion of the said alcohol. The third charge was that there were no indications of any manufacturing ever having been done on or about his place of business. The fourth charge was that he had otherwise violated the terms and conditions of his permit.

These charges were made on November 13, 1923, and the hearing thereon duly came before the federal prohibition agent, designated to conduct revocation proceedings, on November 28, 1923. The law applicable (section 9, National Prohibition Act) is: "If it be found that such person [the permittee] has been guilty of willfully violating any such laws [laws of a state], or has not in good faith conformed to the provisions of this act, such permit shall be revoked."

[4] It is unnecessary to refer in detail to the various provisions of this act, except to say that a permittee, who receives specially denatured alcohol from the government for the purpose of manufacturing disinfectant, and who diverts that alcohol, and seeks to cover up such diversion, by fictitious sales of the disinfectant, is certainly not acting in good faith, in conformity with the provisions of the act and regulations. This really is the claim made here.

The above does not mean, however, that a Commissioner can act arbitrarily, and without some proof of some act of omission or commission on the part of the permittee, and only because he is suspicious, or is not disposed to believe, on general principles, the testimony, or, as the Commissioner here said, "Where there is so much smoke, there must be fire."

[5] The power to take away a man's business under a permit exists, but it is common sense that the "good faith" referred to must be absent in some act of the permittee, so that such act, viewed in the light of the surrounding circumstances, raises the fair inference of lack of good faith. The act of doing nothing, when in good faith a person should have done something, in other words, the act of omission, is just as much an act as an act of commission.

So Judge Campbell has well said: "It was the omission to act, not the commission of acts, with which the plaintiff was charged. She had no right, after receiving the permit, to allow the conditions to prevail which are shown by her own testimony." Schnitzler v. Yellowley, supra, page 853. This is far from saying that an essential part of the proof, justifying the revocation of a permit, must not be proof of some act of omission or commission, before bad faith can be inferred or found.

After the hearing, which apparently consumed a number of days, the Commissioner rendered a lengthy decision. It is not necessary to refer in detail to this, nor even, if the reasons given therein are insufficient, would it follow, as a matter of course, that this court could not take a different view of the testimony, and still find the revocation of the permit proper. I mention this, for the reason that said decision starts off with the statement that "all the charges are found not sustained," with the exception of the charge "whether or not respondent has falsified its sales records. I am going to limit the finding mainly to the accounts against John Miller, Emile Christ, the Broadway Penn Garage, and the Ridgewood Tire Sales Company, who are listed in the sales books as large customers."

The decision then discusses in detail these various customers, and other testimony, and concludes, after the statement that "the evidence is not as strong as might be desired," as follows: "I do not believe, however, that if the respondent had been conducting his business in good faith that he would have shown the animus against the agents which he displayed at the trial. A person with a meritorious case does not have to invent charges against his opponent's witnesses in order to succeed, and would not do so, and respondent appears to have intended to adopt such methods if he had secured the proper backing. I think accordingly, under all the circumstances, that suspicion attaches to the entries in respondent's sales records, and that he is not a suitable person to hold a permit and recommend that the same be revoked."

[6] If the above is intended as conclusions from the testimony, it would seem to appear that the Commissioner has found as a fact that the permittee kept false books, because among other "suspicious" circumstances the permittee, or (as the fact really is) the attorney for the permittee, inquired of a government witness if that witness had not demanded $2,000 of permittee. It would be hard to establish the logical relation between this finding and the proof on which it is based.

A further search of the record must therefore be made. From this record it appears: That the Jefferson Chemical Company, is a trade name, and Charles Hoell, during the time in question, was the proprietor and owner. The plant of the company was located at 20–22 Lexington avenue, Brooklyn, N. Y. In February, 1922, permit No. 12253 (a special denatured alcohol permit), was issued to Hoell by the collector of internal revenue for the First district, granting authority to withdraw at the rate of 2,500 wine gallons of denatured alcohol per month. The permittee filed a bond in the penal sum of $15,000. That this plant occupied the second floor of a two-story brick building, comprising about 2,400 square feet, with a separate storage room for the alcohol, which room would hold about 20 barrels at one time. The premises were leased under a yearly lease, the monthly rental being $85. That the inspection of the premises made showed that there were there installed 24 5-gallon double filters, with funnels attached, one 40-gallon crock, three 25-gallon crocks, and several funnels and filters.

There was on hand, on September 17, 1923, about 250 gallons of finished product, about half of which was bottled, labeled, and stored, on the shelves of the storeroom. There was a fair supply of essential oils and raw material on hand, and a considerable quantity of empty bottles. There were also duplicate copies of the monthly reports filed with the collector, showing that from April 1, 1923, to September 17, 1923, permittee had withdrawn 15,000 wine gallons of special denatured alcohol, and the officer making the inspection ascertained from the sales record that the following quantity of alleged preparations were manufactured: Hair reviver, 6,000 gallons; hair tonics, 11,000 gallons; disinfectant, 11,000 gallons (speaking in round numbers). There was a manager, a delivery wagon and driver, a stenographer, and possibly others employed. The

manager stated that his salary was supposed to be more, but that he got $50 a week, when there was money to pay for it. The inspecting officers testified: "The premises are suitable for their business, and the equipment installed appeared to be adequate."

There is nothing in this record to show any unusual prosperity about this plant. I imagine that, if the Prohibition Law was not in effect, there would be nothing to excite comment about a small business of this kind. Hoell testified he had been in the disinfectant business about eight years. He had invested $30,000 in this particular plant. The concern had on its books less than a dozen customers. It apparently did not keep a manufacturing record book, but did keep a sales record, from and on which the names of these customers appeared. A deputy collector of internal revenue had inspected these records, and the business, regularly at least once a month, and sometimes oftener, and found nothing unusual or out of the way.

Some time previous to the commencement of the proceeding to revoke, a request was received from this permittee to be permitted to withdraw a larger amount of this special denatured alcohol, which entailed the filing of an additional bond. When this request was received, the investigation of September 17, 1923, was ordered. It appears that, on arrival at the place of business of the permittee, the agents saw the manager, and asked for the reason for the increase, and was shown a copy of a proposed business deal by which a large quantity of this disinfectant was to be sold to a concern whose correct name and address apparently appears in the record. So far as I can find this concern was not subpœnaed nor questioned.

Thereupon the officers, after inspection and examination above referred to, went out to see several of these customers, and one of these customers, Miller, stated and put in writing that he had not done business recently with the permittee, although the sales book would indicate that he had. Another of these customers, Christ, stated that he never bought any disinfectant from the permittee, but that he had received a small quantity free of charge, and had been requested by the permittee to say that he had purchased some 2,200 gallons at different times, and for that purpose had received receipted bills from the permittee. Another, Mr. Goldstein, stated he bought, from time to time, disinfectant, but could not say

as to the exact amount; his opinion being that his orders ran from 75 to 100 gallons, while the books of the permittee would show 198 to 500 gallons. At the Ridgewood Tire Sales Company, the agents say, an "employee" told them that his employer had never bought any merchandise from the Jefferson Chemical Company, but later, when the proprietor was seen, he showed receipted bills for 2,400 gallons, and stated that he had bought the disinfectant.

In one case a customer's wife was seen, and what she said (although not produced) was allowed, and in fact hearsay and incompetent testimony of this character appears quite frequently. Again it appears that on the hearing an attorney for the permittee asked one of the agent witnesses about an alleged attempt to extort money, which was denied, and later the manager of the plant, who had previously testified for Hoell and stated that the plant was properly conducted, and at no time attempted to contradict such testimony, was put on the stand by the Commissioner himself to testify that this attorney had asked him (the manager) to substantiate this charge, and that he had refused, because it was not true. He then said that the permittee had also been present, and had urged him to do as his attorney requested. This particular witness admitted that he had previously been convicted of bigamy, and sentenced to 10 years, and had served 4 years, and appears to have volunteered this information as to the attorney and permittee after their talk.

The permittee himself, about 10 years ago, had been convicted of assault, and discharged from the municipal fire department, but had an excellant record in the Spanish War. There is no direct evidence whatever in the record that the permittee ever made this charge of extortion. It is not to be wondered at that, with all this mess before him, the Commissioner was, it seems to me, greatly influenced, and led into a frame of mind where facts and issues were lost sight of.

The substantial issue before the Commissioner was whether or not the permittee had in good faith conformed to the provisions of the National Prohibition Act. This would only be determined by proof that the permittee had done or omitted to do something which the National Prohibition Act required or forbade.

The sole charge held by the Commissioner to remain was, as I have said, whether or not the permittee had falsified his sales book. In this review by me I have sought in a broader way to find whether there is any

evidence that permittee had or had not in good faith obeyed the law under which his permit had been granted.

[7] Surely there is no presumption that he falsified his books, or otherwise acted in bad faith. Some fact must be proved which shows it, or from which such reasonable inference appears. The agents testified to the plant and equipment being all right. The manager testified that everything was all right. The permittee testified to the same. The customers in question each went on the stand and testified that they bought substantially as per book from the permittee. It appears that these purchases were largely in cash, and the customers were not such as to occasion surprise at their lack of exact books and bookkeeping.

The representatives from the collector of internal revenue stated that they had made monthly inspections of the plant and business and found everything all right. Where, then, was there any proof in all this of any act by the permittee on which one can legally base a finding that he had disobeyed the law? Where was there any proof that he had omitted to do anything that the law required?

I am not aware that the law requires a permittee to keep any particular bookkeeping outfit (Pennsylvania Mfg. Co. v. Haynes, D. C., Judge Schoonmaker, Western District, Pennsylvania, November, 1923, not reported), nor is it in the law that a permittee must not sell for cash or to customers who do not keep books. What the law does require is that the special denatured alcohol be solely used in making the product, whether disinfectant or otherwise, and if it appears by some competent proof that there is a plain discrepancy between the amount of special denatured alcohol used and the amount on hand and products sold, a fair inference may arise that this missing quantity has been diverted, and bad faith exists. However, here the application was for more alcohol; the only inference, if any, from this being that he was not receiving enough.

No attempt was made to show that the permittee's explanation for this request was incorrect or doubtful; and so far as I can see the proof relied on, outside of suspicion and possibly natural resentment, was the reports of the investigating agents as to what was said to them, in the absence of the permittee, by two of his customers, to wit, Miller and Christ, and the statement in writing made by the customers. This same situation existed on the trial before me. The permittee testified to nothing that would in-

dicate bad faith; neither did the two representatives of the internal revenue collector. The four customers in question testified that they had dealt with the permittee, while the government relied, as it did before the Commissioner, on practically the same testimony of the three revenue agents.

These revenue agents testified to statements, already referred to, made by Miller and Christ. The written statement of Miller and the written statement of Christ were also before me, as they were before the Commissioner. That such prior contradictory statements by Miller and Christ were proper on cross-examination I think will be conceded. That they destroyed the credibility of Miller and Christ, at least with me, is a fact.

"Would the cross-examining party be entitled to prove the fact as a part of and as tending to his case? If he would be allowed to do so, the matter is not collateral. If he would not be allowed to do so, it is collateral." State v. Brock (S. C.) 126 S. E. 28; Wigmore on Evidence, § 1020.

"As to matters not collateral the denial of the witnesses can be contradicted." Attorney General v. Hitchcock, 1 Exchange, 99; Wigmore on Evidence, § 1020; State v. Brock, supra, and cases cited.

"As to matters that are collateral, a denial binds the party asking questions, with certain definite exceptions." People v. Greenwall, 108 N. Y. 296, 15 N. E. 404, 2 Am. St. Rep. 415; Civ. Pr. Act, § 350; Hoag v. Wright, 174 N. Y. 36, 66 N. E. 579, 63 L. R. A. 163.

But this means that the alleged evidence relied on to show a diversion of alcohol, or falsity in the books of permittee, was evidence which must be confined to the purpose thereof, to wit, the impeachment of the witnesses.

"It is manifest that such evidence was competent only for the purpose of contradicting defendant's witnesses, and was wholly incompetent as substantive evidence tending to show that the agent of the defendant company had made the offers which were the subject-matter of the conversations testified to by the contradicting witnesses." Judge Taft, in Baltimore R. Co. v. Rambo, 59 F. 75, 8 C. C. A. 6.

The judge goes on to say: "It is very difficult, indeed, for a jury to discriminate between evidence which is only to impeach the credibility of witnesses and evidence which tends to establish facts material to the main issue." Page 83.

Nor is evidence of an attorney's mistaken

or reprehensible zeal substantive evidence, even if joined by his client, nor are the facts affecting the credibility of the permittee and his manager substantive evidence. Accordingly, eliminating from the substantive evidence all such special-purposed testimony, and eliminating from the case the entire testimony of Miller and Christ, we still have no evidence of a substantive nature to support a finding that the permittee did something illegal, or omitted to do something that the law required.

True, the case may be suspicious, but suspicion is not substantive evidence. I fail to find any substantive evidence of bad faith before the Commissioner or before me. The mere discrepancies as to quantities ordered and received, not proved, but argued to exist from the memory of customer witnesses, who did a cash business, is not sufficient evidence of bad faith in this case; certainly not sufficient, in the light of permittee's testimony under oath and that of his manager, delivery driver, agents of the collector's office, plus his sales books, to prove the books false, and yet that is all that seems to remain in the case.

Therefore, although I take no stock in the not unusual story of men like Miller and Christ, in their dealings with the revenue agents, trying to do their duty, and fully appreciate the difficulty of a so-called "hearing judge" in sifting out facts from cases like this, it seems to me that it is only just that, if this permittee is to have his permit revoked, such revocation should at least rest on some proof that by some act of his, or omission to act, over which he could reasonably be found to have control, he has not in good faith obeyed the law by which he got his permit.

There being no such proof here, although lots of testimony, I am obliged to reverse the finding of the Commissioner, and direct that the permit be restored.